IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| CHAPARRAL ENERGY LLC, )<br>)<br>    Plaintiff/Counter-Defendant, )<br>)<br>v. )<br>)<br>TENN-TEX PARTNERS LLC; )<br>TENN-TEX PARTNERS II LLC; )<br>FLAVIOUS J. SMITH; WILLIAM )<br>HULSEY SMITH; PEYTON MILLER )<br>SMITH; and MELANIE ARRINGTON )<br>SMITH, )<br>)<br>    Defendants/Counter-Plaintiffs. ) | Case No. CIV-21-01020-JD |

## ORDER

Before the Court is Plaintiff/Counter-Defendant's Motion to Dismiss Defendants/Counter-Plaintiffs' Amended Counterclaims in Part ("Motion"). [Doc. No. 30].[1] Defendants/Counter-Plaintiffs have responded in opposition ("Response") [Doc. No. 35], and Plaintiff/Counter-Defendant filed a reply ("Reply") [Doc. No. 36]. Chaparral Energy, LLC ("Chaparral") filed this action in Canadian County District Court against Tenn-Tex Partners, LLC ("TTP"), Tenn-Tex Partners II, LLC ("TTPII"), and the Smith Family[2] alleging unjust enrichment/money had and received/restitution, breach of the Joint Operating Agreement, and lien foreclosure. [Doc. No. 9-2]. TTP, TTPII, and the

---

[1] The Court uses CM/ECF page numbering from the top of docket filings in this Order.

[2] Defendants Flavious J. Smith, William Hulsey Smith, Peyton Miller Smith, and Melanie Arrington Smith are collectively referred to as the Smith Family.

Smith Family (collectively, "Defendants/Counter-Plaintiffs") removed the action to this Court under 28 U.S.C. § 1332 and answered and asserted various counterclaims against Chaparral. [Doc. Nos. 1, 9 and 24].

Chaparral moves under Federal Rule of Civil Procedure 12(b)(6) to dismiss certain amended counterclaims of Defendants/Counter-Plaintiffs for failure to state a claim. Specifically, Chaparral moves to dismiss Counterclaims One, Two, Four, and Five that relate to an alleged separate netting agreement among the parties. Additionally, Chaparral moves to dismiss all forms of relief relying on damages allegedly sustained because of Chaparral's liens against Defendants/Counter-Plaintiffs' leasehold interests. Upon consideration, the Court grants in part and denies in part the Motion.

I. **BACKGROUND**

Construing the allegations in the amended counterclaims in the light most favorable to Defendants/Counter-Plaintiffs, and taking all well-pleaded allegations as true,[3] Chaparral, TTP, TTPII, and the Smith Family are working interest owners in certain oil and gas leases covering Section 15-11N-7W, Canadian County, Oklahoma ("Section 15"). Am. Answer & Countercls. [Doc. No. 24] ¶ 83. Development and operations to produce oil and gas from Section 15 are governed by a Joint Operating

---

[3] *See Ashley Creek Phosphate Co. v. Chevron USA, Inc.*, 315 F.3d 1245, 1267 (10th Cir. 2003) (explaining that a Rule 12(b)(6) motion to dismiss a counterclaim is evaluated under the same standards as a Rule 12(b)(6) motion to dismiss a claim); *Jones v. Addictive Behav. Change Health Grp., LLC*, 364 F. Supp. 3d 1257, 1265 (D. Kan. 2019) (same); *see also Ridge at Red Hawk, L.L.C. v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007) (explaining the court must "assume the truth of the plaintiff's well-pleaded factual allegations and view them in the light most favorable to the plaintiff").

Agreement ("JOA") dated September 4, 1985. *Id.* ¶ 84; *see also* JOA [Doc. No. 24-1].[4] Chaparral, TTP, TTPII, and the Smith Family are parties or successors in interest to the JOA; Chaparral is the current Operator, and the others are Non-Operators. Am. Answer & Countercls. ¶ 85.

The JOA agreement, which is incorporated by reference in both the governing complaint [Doc. No. 9-2] and the amended answer and counterclaims [Doc. No. 24-1], and attached as an exhibit to both pleadings, states in Article VII(B), in pertinent part, that:

> [U]pon default by any Non-Operator in the payment of its share of expense, Operator shall have the right, without prejudice to other rights or remedies, to collect from the purchaser the proceeds from the sale of such Non-Operator's share of oil and/or gas until the amount owed by such Non-Operator, plus interest, has been paid.

JOA at Art. VII(B).

Article VII(C) places a duty on Chaparral, as the Operator, to keep accurate accounting records, to "promptly pay and discharge expenses incurred in the development and operation of the Contract area pursuant to the [JOA]," and to "charge each of the parties . . . with their respective proportionate shares . . . ." *Id.* at Art. VII(C). Chaparral must also furnish each non-operator with "an itemized statement of all costs and liabilities incurred in the operation of the well, together with a statement of the

---

[4] In ruling on a motion to dismiss, the Court may consider documents referred to in the pleadings if those documents are attached and there is no dispute as to their authenticity. *See Gee v. Pacheco*, 627 F.3d 1178, 1186 (10th Cir. 2010).

quantity of oil and gas produced . . . and the amount of proceeds realized . . . during the preceding month." *Id.* at Art. VI.

Article IV(A) tasks Chaparral with procuring abstracts and obtaining title examination and division order title opinions from attorneys. Under the JOA, non-operators may vote to remove Chaparral if Chaparral "fails or refuses to carry out its duties hereunder, or becomes insolvent, bankrupt or is placed in receivership." *Id.* at Art. V(B)(1). Removal of the Operator requires an "affirmative vote of two (2) or more Non-Operators owning a majority interest . . . remaining after excluding the voting interest of Operator." *Id.* Defendants/Counter-Plaintiffs allege that TTP, TTPII, and the Smith Family have a majority interest in Section 15 after excluding Chaparral's voting interest. Am. Answer & Countercls. ¶ 89.

The dispute between Chaparral and Defendants/Counter-Plaintiffs centers around four wells in Section 15, known as the "Lassen Wells," which began producing in September 2019. *Id.* ¶ 98. Chaparral spudded[5] the Lassen Wells in May 2019. *See id.* Defendants/Counter-Plaintiffs allege that on June 21, 2019, TTP assigned a working interest in the proposed Lassen Wells to TTPII and the Smith Family, recording the assignments and putting Chaparral on constructive notice. *Id.* ¶ 97.

In August 2019, Flavious Smith, acting as the representative of TTP, TTPII, and the Smith Family, notified Chaparral that it was sending incorrect joint interest billings ("JIBs"), which commingled the accounts for TTP and TTPII and made it impossible to

---

[5] To "spud" a well means to begin drilling operations.

4

determine what charges were owed by which entity. *Id.* ¶ 99. Defendants/Counter-Plaintiffs allege that Chaparral did not correct its errors, but rather, in November 2019, sent identical letters to TTP and the Smith Family stating they had overdue invoices without specifying the amounts. *Id.* ¶ 100.

Flavious Smith then wrote a letter to Chaparral, attention Amy McNeill, dated November 15, 2019, explaining that the November notices were incorrect because TTP did not have an interest in the Lassen Wells and that ownership in Chaparral's division orders showed incorrect interests for the Smith Family, given the non-consent interests did not add up correctly. *Id.* ¶ 101; *see also* Letter [Doc. No. 24-2]. Defendants/Counter-Plaintiffs allege that Smith offered in the letter a compromise to resolve Chaparral's accounting errors "to mitigate any hardship by Chaparral," by agreeing that Chaparral "may net their revenues against their joint interest billings, while [they] await accurate division orders." *See* Am. Answer & Countercls. ¶ 101.

On November 18, 2019, Cindy Palmer, Chaparral's Accounting Clerk II, in the JIB Department, emailed Flavious Smith stating in pertinent part:

> After reviewing and talking with our Land Dept it has been found that the wrong Owner information was listed on the AFE report that was submitted to our DO [Division Order] Department . . . . it might be February or March before you see the changes (with the holidays and all). With that, I have made a note on our records that no legal action will be taken on this matter and that we are to clear the issue with the Lassen Wells on our end.

*Id.* ¶ 103; *see also* Email [Doc. No. 24-3]. Flavious Smith followed up with Palmer by telephone the same day. Am. Answer & Countercls. ¶ 104. Defendants/Counter-Plaintiffs allege that Palmer advised in the phone call that given Chaparral's mistakes, Chaparral

5

would net the interests per the JOA. *See id.* Palmer further allegedly advised that Chaparral was agreeing to netting as its sole remedy. *See id.*

Defendants/Counter-Plaintiffs contend that the November 15, 2019 letter from Flavious Smith, Palmer's email, and Palmer's representations during the November 18 phone call amount to a separate netting agreement, i.e., a promise by Chaparral not to take legal action but to instead net out amounts due. *See id.* In reliance on the supposed netting agreement, Defendants/Counter-Plaintiffs did not take any action against Chaparral, thereby waiving their calendar year 2018 audit rights and rights to challenge certain bills and payments. *Id.* ¶ 106. Chaparral's delay in correcting the accounting errors resulted in increased interest and costs. *See id.* ¶ 108. Following the alleged netting agreement, Chaparral executed and carried out the agreement by netting the interests of TTP, TTPII, and the Smith Family against the amounts that Chaparral claimed they owed. *Id.* ¶ 109.

Months later in February 2020, Chaparral sent new division orders still erroneously listing TTP as an owner in the Lassen Wells and failing to correct the non-consent interests. *Id.* ¶ 111. It also deposited $397,586.16 in TTP's bank account. *Id.* ¶ 114. This amount, Defendants/Counter-Plaintiffs allege, represented comingled production revenue for TTP's interest in certain wells and TTPII's interest in the Lassen Wells. *See id.* Likewise, the Smith Family received payment from Chaparral for their share of revenues for the first six months of production from the Lassen Wells, but they contend that they cannot determine if the amounts received are accurate because the non-consent interests are still not reflected in Chaparral's title opinions. *Id.* ¶ 115.

6

In August 2020, Chaparral filed for bankruptcy. *Id.* ¶ 117. The Smith Family received notice of Chaparral's filing on or about October 14, 2020. *See id.* After filing for bankruptcy, Chaparral ceased communications with the Smith Family. *See id.*

In February 2021, the TTP, TTPII, and the Smith Family received 1099s, which showed revenues netted for the unpaid JIBs. *Id.* ¶ 118. Peyton Smith received a 1099 showing revenue netted, but he never received JIBs or netting statements from Chaparral. *Id.* ¶ 119. In May 2021, Peyton Smith asked Chaparral for documentation underlying the 1099, but Chaparral did not provide any documents in response. *See id.* Peyton Smith notified Chaparral on June 1, 2021, that he intended to initiate an audit of the joint account pursuant to the terms of the JOA. *Id.* ¶ 120; *see also* JOA at Exhibit C, § I(5). Two days later, Chaparral filed liens in Canadian County District Court against the interests of TTP, TTPII, and the Smith Family in Section 15. *See* Am. Answer & Countercls. ¶¶ 121, 124.

Defendants/Counter-Plaintiffs allege that Chaparral filed amended liens in September 2021, and that the liens, which are public record, include false assertions that damage the Smith Family's credit worthiness, cloud their title, reduce the value of their property interests, and impede their ability to engage in business. *Id.* ¶¶ 121, 123, 133. Specifically, they allege that the lien amounts do not correspond to the amounts shown on the September 2021 JIB statements; that the lien against TTP is false because Chaparral owed TTP a credit; that the liens against the Smith Family include false amounts because Chaparral never corrected the non-consent elections; that the lien against Peyton Smith is not legitimate given Peyton never received a JIB or netting statement; and that Chaparral

7

filed the liens with the intent to deceive the public and to induce the court to foreclose on the interests to enrich Chaparral. *Id.* ¶¶ 124, 126–28, 130. Additionally, they allege that Chaparral filed the liens in retaliation to Peyton Smith's proposed audit and to intimidate and harass the Smith Family. *Id.* ¶ 132.

On June 25, 2021, TTPII initiated an audit of the Lassen Wells. *Id.* ¶ 134. As a result of the audit, TTPII discovered illegitimate charges, inaccurate net revenue percentages, title opinion errors, unauthorized fees, and inaccurate revenue calculations and disbursements by Chaparral. *Id.* ¶¶ 135–36. Chaparral has allegedly refused to "meaningfully engage" in the audit process and has declined to provide documentation requested by the Smith Family, and in September 2021, Chaparral indicated it would no longer participate in the audit, despite its responsibilities as Operator under the JOA. *Id.* ¶¶ 138, 140.

This action was filed by Chaparral on September 24, 2021. Chaparral seeks recovery of $392,116.58, which it alleges it erroneously paid to TTP for production from the Lassen Wells occurring after TTP had conveyed its interests in the Lassen Wells to TTPII. *See* Motion at 8. Chaparral asserts that it updated its records to reflect TTPII as the correct owner and made a corresponding payment to TTPII in the amount of $392,116.58. *See id.* Chaparral contends that despite repeated demands, TTP has refused to remit the original erroneous payment. *See id.* Thus, Chaparral asserts claims for unjust enrichment, money had and received, and restitution against TTP. Chaparral also seeks recovery of more than $1.5 million in JIBs for expenses from the Lassen Wells allegedly owed by TTPII and the Smith Family and asserts claims against them for breach of the

JOA and to foreclose on liens filed against their leasehold interests in Section 15. *See id.* at 8–9; *see also generally* [Doc. No. 9-2] at 7–9.

Defendants/Counter-Plaintiffs assert that in the years they have dealt with Chaparral, Chaparral has repeatedly committed title and accounting errors, refused to provide correct information, and filed for bankruptcy twice. Response at 7. They assert that in November 2019 the state of Chaparral's title and accounting practices under the JOA "was in significant disarray," and this led to Chaparral and the Smith Family negotiating and entering the netting agreement. *See id.*

On September 24, 2021, TTPII notified Chaparral that it intended to call a vote to remove Chaparral as Operator pursuant to the terms of the JOA. Am. Answer & Countercls. ¶ 144; *see also* [Doc. No. 24-4]. Chaparral responded that because the parties are in default they cannot vote for Chaparral's removal. Am. Answer & Countercls. ¶ 145. Defendants/Counter-Plaintiffs allege that Chaparral's claims of default and foreclosure violate the separate netting agreement. *Id.* ¶ 146. Defendants/Counter-Plaintiffs filed an answer and counterclaims in state court. Then, following removal to this Court and an order by this Court for the parties to confer regarding the issues raised in the original motion to dismiss [Doc. Nos. 13, 17], they filed amended counterclaims.

At issue in the Motion are Defendants/Counter-Plaintiffs' Counterclaims One, Two, Four, and Five. In Counterclaim One, Defendants/Counter-Plaintiffs seek a declaration under Oklahoma's Declaratory Judgments Act, Okla. Stat. tit. 12, § 1651, to declare, among other things, that Chaparral is bound by the promises in the alleged separate netting agreement and prohibited from bringing this action. Am. Answer &

9

Countercls. ¶ 151(a). In Counterclaim Two, they assert a promissory estoppel claim based on the separate netting agreement. *See id.* ¶¶ 153, 155. In Counterclaim Four, Defendants/Counter-Plaintiffs allege that Chaparral breached the netting agreement, which they assert is a valid and enforceable contract. *See id.* ¶ 164. Finally, in Counterclaim Five, which is pled alternatively to Counterclaim Four, Defendants/Counter-Plaintiffs allege actual and constructive fraud by Chaparral based on the netting agreement, in violation of Okla. Stat. tit. 15, §§ 58 and 59. *See id.* ¶¶ 173, 174.

## II.   STANDARD OF REVIEW

A Rule 12(b)(6) motion to dismiss a counterclaim is evaluated under the same standards as a Rule 12(b)(6) motion to dismiss a claim. *See Ashley Creek*, 315 F.3d at 1267; *Jones*, 364 F. Supp. 3d at 1265. To survive a motion to dismiss under Rule 12(b)(6), a counterclaim must contain "enough facts to state a claim to relief that is plausible on its face." *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A [counterclaim] has facial plausibility when the [counterclaimant] pleads factual content that allows the court to draw the reasonable inference that the [counter defendant] is liable for the misconduct alleged." *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The Court may "draw on its judicial experience and common sense" in determining whether a counterclaim states a plausible claim. *See id.* at 679.

Although detailed factual assertions are not necessary, a pleading that offers only "labels and conclusions" or "pleads facts that are merely consistent with a [counter defendant's] liability" will not suffice. *See id.* (internal quotation marks and citations

omitted). The burden is on the counterclaimant to plead factual allegations that "raise a right to relief above the speculative level." See *Twombly*, 550 U.S. at 555.

Under this standard, the Court accepts all well-pleaded factual allegations as true and views the allegations in the light most favorable to the nonmoving party. *Peterson v. Grisham*, 594 F.3d 723, 727 (10th Cir. 2010). The Court, however, does not accept as true any legal conclusions within the answer or amended counterclaims. *Iqbal*, 556 U.S. at 678; *Twombly*, 550 U.S. at 555. The Rule 12(b)(6) standard does not require that a counterclaimant establish a prima facie case in the pleading, but the elements of each cause of action help to determine whether the counterclaimant has set forth a plausible counterclaim. *Khalik v. United Air Lines*, 671 F.3d 1188, 1192 (10th Cir. 2012). "The court's function on a Rule 12(b)(6) motion is not to weigh potential evidence that the parties might present at trial, but to assess whether the [counterclaim] alone is legally sufficient to state a claim for which relief may be granted." See *Smith v. United States*, 561 F.3d 1090, 1098 (10th Cir. 2009) (citation omitted). However, "the mere metaphysical possibility that *some* plaintiff could prove *some* set of facts in support of the pleaded claims is insufficient; the [counterclaim] must give the court reason to believe that *this* plaintiff has a reasonable likelihood of mustering factual support for *these* claims." See *Anderson v. Suiters*, 499 F.3d 1228, 1232 (10th Cir. 2007) (quoting *Ridge at Red Hawk*, 493 F.3d at 1177). The Court's review to determine whether a counterclaim states a plausible claim for relief surviving a motion to dismiss is a "context-specific task." See *Iqbal*, 556 U.S. at 679.

### III. ANALYSIS

**A. The Court grants dismissal of Counterclaims Four (Breach of Netting Agreement), One (to the extent it presupposes a separate Netting Agreement), and Two (Promissory Estoppel) because they fail to state plausible claims for relief.**

Chaparral argues that Defendants/Counter-Plaintiffs' claims based on the netting agreement "fail to articulate a plausible claim for the existence of a 'Netting Agreement' enforceable against Chaparral." Motion at 14. According to Chaparral, when Flavious Smith wrote Chaparral on November 15, 2019, "he was only proposing a procedure *Chaparral already had the right to invoke* under the terms of the JOA . . . ." *Id.* at 17 (emphasis in original).

The JOA, under Article VII, Expenditures and Liability of Parties, and under subsection (B), Liens and Payment Defaults, provides in pertinent part:

> Each Non-Operator grants to Operator a lien upon its oil and gas rights in the Contract Area, and a security interest in its share of oil and/or gas when extracted and its interest in all equipment, to secure payment of its share of expense, together with interest thereon at the rate provided in Exhibit "C." To the extent that Operator has a security interest under the Uniform Commercial Code of the state, Operator shall be entitled to exercise the rights and remedies of a secured party under the Code. The bringing of a suit and the obtaining of judgment by Operator for the secured indebtedness shall not be deemed an election of remedies or otherwise affect the lien rights or security interest as security for the payment thereof. In addition, upon default by any Non-Operator in the payment of its share of expense, Operator shall have the right, without prejudice to other rights or remedies, to collect from the purchaser the proceeds from the sale of such Non-Operator's share of oil and/or gas until the amount owed by such Non-Operator, plus interest, has been paid.

JOA at Art. VII(B). By its plain terms, the JOA authorizes Chaparral to net the revenues of non-operators who fail to pay JIBs. Additionally, the JOA permits the filing of liens and states that netting is without prejudice to other rights or remedies. Defendants/Counter-Plaintiffs agree in their well-pleaded allegations that "[n]etting out the JIBs is a remedy under the JOA for unpaid balances." Am. Answer & Countercls. ¶ 105.

As alleged, Defendants/Counter-Plaintiffs ask the Court to declare Chaparral "bound by the promises" in the netting agreement and to declare netting as its exclusive remedy. *Id.* ¶ 151a. They allege that Chaparral and TTP, TTPII, and the Smith Family are parties or successors-in-interest "to the Netting Agreement, a valid, enforceable contract," and that the parties "*formed* the Netting Agreement." *Id.* ¶¶ 164–65 (emphasis added). These allegations make clear that Defendants/Counter-Plaintiffs are asserting that the netting agreement is its own, standalone contract.[6]

---

[6] The Court disregards the modification arguments raised in the Motion, Response, and Reply. The allegations in these counterclaims are an attempt to state a separate contract for netting, *see id.* ¶ 104, not a modification of the JOA, which contains netting as a provision. That is, Defendants/Counter-Plaintiffs do not allege modification in their actual counterclaims for the breach of netting agreement, and any single, conclusory reference in the declaratory judgment count is not sufficient to plead modification. *See Dubbs v. Head Start, Inc.*, 336 F.3d 1194, 1201 (10th Cir. 2003) (stating that, for Rule 12(b)(6) motions, a court is required to only consider the facts alleged in the complaint). To the extent that Defendants/Counter-Plaintiffs now urge modification, such claim or theory is rejected because they cannot amend their counterclaims in their Response, and the Court does not allow it here. *See* Fed. R. Civ. P. 7(b); *Albers v. Bd. of Cnty. Comm'rs of Jefferson Cnty.*, 771 F.3d 697, 706 (10th Cir. 2014) ("We have recognized the importance of Fed. R. Civ. P. 7(b) and have held that normally a court need not grant leave to amend when a party fails to file a formal motion.") (quoting *Calderon v. Kan. Dep't of Soc. & Rehab Servs.*, 181 F.3d 1180, 1186 (10th Cir. 1999)); *Earles v. Cleveland*, 418 F. Supp. 3d 879, 892 n.3 (W.D. Okla. 2019), *aff'd*, 825 F. App'x 544 (10th Cir. 2020) (unpublished) (disregarding factual allegations in the plaintiff's response

The elements of a breach of contract action under Oklahoma law[7] are: "(1) formation of a contract, (2) breach of the contract, and (3) damages as a result of that breach." *Morgan v. State Farm Mut. Auto. Ins. Co.*, 488 P.3d 743, 748–49 (Okla. 2021) (citing *Digital Design Grp., Inc. v. Info. Builders, Inc.*, 24 P.3d 834, 843 (Okla. 2001)). A valid contract requires: (1) an offer by one party, (2) acceptance by the other, and (3) consideration, meaning each party "must give something of value or promise to give something of value in exchange for what the other gives or promises." *See* OUJI Civil Instr. No. 23.2.

Defendants/Counter-Plaintiffs have not plausibly alleged formation of a separate contract (i.e., the netting agreement), and without a contract, there can be no breach of the netting agreement. Netting is an option under the existing JOA, as alleged by Defendants/Counter-Plaintiffs. *See* Am. Answer & Countercls. ¶ 105. Chaparral already had the right to net under the JOA upon a plain reading of the language.

The Court, drawing on its judicial experience and common sense, concludes that it is simply implausible to infer that the exchanges, as alleged, constitute a separate netting agreement when the existing contract (JOA) allows for netting. The Court reads the

---

brief that were beyond the scope of her complaint because a plaintiff may not effectively amend a complaint by alleging new facts in a response to a motion to dismiss).

[7] The substantive law of Oklahoma governs the Court's analysis in this diversity case. *See Haberman v. Hartford Ins. Grp.*, 443 F.3d 1257, 1264 (10th Cir. 2006) (explaining that "[i]n diversity cases, the substantive law of the forum state governs the analysis of the underlying claims"); *see also* JOA at Art. XIV(B) (noting that the JOA and all matters pertaining to it are governed and determined by the law of the state in which the Contract Area is located, which is Oklahoma).

November 15, 2019 letter, Palmer's November 18 email, and the alleged phone call between Palmer and Smith to simply indicate that the parties were on the same page that Chaparral would net, as it was entitled to do under the JOA. The Court is "not bound to accept as true a legal conclusion" that a claim exists, *see Twombly*, 550 U.S. at 555, and thus disregards the allegation that the letter, email, and phone call "constitute" the netting agreement. *Id.* ¶ 104; *see also Twombly*, 550 U.S. at 564 ("Although . . . statements speak directly of an agreement, on fair reading these are merely legal conclusions . . . .").

Construing the well-pleaded allegations as true, Chaparral exercised the right to net under the JOA. *See* Am. Answer & Countercls. ¶¶ 109, 118, 146. Whether Chaparral did so in breach of the JOA is a separate issue not before the Court. But even construing the allegations in Defendants/Counter-Plaintiffs' favor, there is no plausible claim for a separate netting agreement. Defendants/Counter-Plaintiffs "have not nudged their claims across the line from conceivable to plausible" based on the allegations in their Amended Answer and Counterclaims. *Twombly*, 550 U.S. at 570. Thus, the Court dismisses Counterclaim Four (Breach of the Netting Agreement) for failure to state a claim under Rule 12(b)(6). The Court also dismisses paragraph 151(a) of Counterclaim One to the extent such declaratory judgment claim presupposes a separate or standalone netting agreement.

For these same reasons, the Court dismisses Counterclaim Two for promissory estoppel. Chaparral contends that Defendants/Counter-Plaintiffs' allegations "fail to articulate a plausible claim for the existence of a 'Netting Agreement' enforceable against Chaparral" for their promissory estoppel theory. *See* Motion at 14. Because Oklahoma

law does not permit a party to claim any rights under a promissory estoppel theory greater than those agreed to by the parties in their written agreement, the Court agrees with Chaparral that Defendants/Counter-Plaintiffs have not stated a plausible claim for promissory estoppel. *See Parsia, Inc. v. John E. Barbre Trust*, 500 P.3d 667, 673 (Okla. Civ. App. 2021) (recognizing that "there is no authority in Oklahoma that would grant a litigant (under a promissory estoppel claim) greater rights than those agreed to by the parties in their written agreement"); *cf. Aviation Training Devices, Inc. v. Flightsafety Servs. Corp.*, No. 19-CV-0215-CVE-FHM, 2020 WL 806368, at *7 (N.D. Okla. Feb. 18, 2020) (granting dismissal of promissory estoppel claim where "the alleged promises or agreements forming the basis for . . . promissory estoppel claims fall within the scope of the parties' written agreement").

Consequently, the Court grants the Motion as to these counterclaims and dismisses them without prejudice.

**B.      The Court grants dismissal of Counterclaim Five (Fraudulent Netting Agreement) because it fails to state a plausible claim for relief.**

Chaparral argues that no fraud claim can exist because no "enforceable 'Netting Agreement'" exists. Motion at 14; *see id.* at 26 (arguing that the fraud claim fails because "no enforceable 'Netting Agreement' was ever formed").

In Oklahoma, fraud is divided into two categories: actual fraud and constructive fraud. *See Sutton v. David Stanley Chevrolet, Inc.*, 475 P.3d 847, 852 (Okla. 2020). "Fraud relieves a party of the duty to perform a contract." OUJI Civil Instr. No. 23.33.

Actual fraud "includes any statement [or act] that is intended to deceive another party in order to influence [him/her] to enter into the contract. In addition, the party must have relied on the fraudulent statement [or act] in entering the contract." *See id.* Actual fraud consists of:

> (1) A suggestion, as a fact, of something that is not true, when the person making the suggestion does not believe it to be the truth; or (2) A positive statement of something that is not true, when the person making it had no reasonable basis for the statement; or (3) A person's concealing something that [he/she] knows is the truth; or (4) A promise made without any intention of performing it; or (5) A person's remaining silent when [he/she] had a duty to speak . . . ; or (6) Any other statement [or act] intended to deceive.

*See id.*; *see also* Okla. Stat. tit. 15, § 58.

"In contrast with actual fraud, constructive fraud does not require an intent to deceive." *Sutton*, 475 P.3d at 853. Constructive fraud is defined at Okla. Stat. tit. 15, § 59. It consists of "any breach of duty which, without an actually fraudulent intent, gains an advantage to the person in fault, or any one claiming under him, by misleading another to his prejudice, or to the prejudice of any one claiming under him." Okla. Stat. tit. 15, § 59.

Defendants/Counter-Plaintiffs allege actual and constructive fraud by Chaparral based on the netting agreement, in violation of Okla. Stat. tit. 15, §§ 58 and 59. Am. Answer & Countercls. ¶ 174. Specifically, they allege that Chaparral formed the netting agreement with the intent to deceive them or to induce them into not taking legal action against Chaparral. *Id.* ¶¶ 170–72.

The alleged fraud here is predicated on formation of the netting agreement. Because Defendants/Counter-Plaintiffs have not plausibly alleged a separate netting agreement apart from the JOA, their fraud claim necessarily fails.[8] Thus, the Court dismisses without prejudice Counterclaim 5 (Fraudulent Netting Agreement) for failure to state a claim.

> **C.      The Court denies the aspect of the Motion directed at liens because it represents an improper use of Rule 12(b)(6).**

Chaparral contends that Defendants/Counter-Plaintiffs are barred under Oklahoma's litigation privilege from asserting any theory of liability based on Chaparral's filing of liens. Motion at 27. Specifically, Chaparral argues that Defendants/Counter-Plaintiffs cannot seek a civil remedy based on lien statements. *Id.* at 31. Chaparral asks the Court to dismiss all forms of relief that rely on damages allegedly arising from Chaparral's liens based on Oklahoma's absolute litigation privilege. *Id.*

The JOA allows for Chaparral to file liens. JOA at Art. VII(B). Chaparral also appears to acknowledge that Defendants/Counter-Plaintiffs, as parties against whom the liens are asserted, get to defend on the lien. Motion at 28 (asserting that the alleged falsification serves as a defense in the underlying action). Chaparral also acknowledges that Defendants/Counter-Plaintiffs do not allege any "overt 'cause of action' based on the liens." *Id.* at 30 n.4.

---

[8] Additionally, Defendants/Counter-Plaintiffs' allegations are too conclusory to meet the pleading standards under the Federal Rules. *See* Fed. R. Civ. P. 9(b); *see also Koch v. Koch Indus., Inc.*, 203 F.3d 1202, 1236 (10th Cir. 2000).

A motion under Rule 12(b)(6) is an improper vehicle for Chaparral to bring this contention. Rule 12(b)(6) is directed at claims, not at remedies or other matters. *See* Fed. R. Civ. P. 12(b)(6); *see also United States v. Water Supply & Storage Co.*, Civil Action No. 1:23-cv-00533-CNS-NRN, 2023 WL 7924736, at * 3 (D. Colo. Nov. 16, 2023) ("[T]he function of a Rule 12(b)(6) motion is to assess the sufficiency of a claim, not the prayer for relief."). "It is well settled that the prayer for relief is no part of the cause of action and that the parties are entitled to such relief and to such judgment as the complaint—the counterclaim in this case—makes out." *Daniels v. Thomas*, 225 F.2d 795, 797 (10th Cir. 1955); *see also Coll v. First. Am. Title Ins. Co.*, 642 F.3d 876, 901 (10th Cir. 2011); *Reininger v. Oklahoma*, 292 F. Supp. 3d 1254, 1266 (W.D. Okla. 2017).

The arguments by Chaparral challenge not a specific claim but rather the relief sought by Defendants/Counter-Plaintiffs on the liens. That is improper at this stage. Thus, the Court denies this aspect of the Motion.

## IV.    **CONCLUSION**

For these reasons, the Court GRANTS in part and DENIES in part Plaintiff/Counter-Defendant's Motion to Dismiss Defendants/Counter-Plaintiffs' Amended Counterclaims in Part ("Motion"). [Doc. No. 30]. The Court dismisses without prejudice Counterclaims Two (Promissory Estoppel), Four (Breach of Netting Agreement), and Five (Fraudulent Netting Agreement) for failure to plausibly allege a claim. The Court also dismisses paragraph 151(a) of Counterclaim One to the extent such declaratory judgment claim presupposes a separate netting agreement. The Court denies the aspect of the Motion challenging the liens at this stage of the proceeding.

IT IS SO ORDERED this 25th day of July 2024.

_____
JODI W. DISHMAN
UNITED STATES DISTRICT JUDGE